**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KEITH D. WILKEY,                                    Case No. 1:04cv768

        Plaintiff,                                    Judge Barrett

    v.

THE MCCULLOUGH-HYDE
MEMORIAL HOSPITAL, et al.,

        Defendants.

## <u>ORDER</u>

This matter is before the Court pursuant to Defendants' Motion for Summary
Judgment (Doc. 56). Plaintiff filed a response (Docs. 71, 73, 81, 92) to which Defendants
replied (Doc. 80, 94). Defendants then filed a supplemental Motion for Summary
Judgment (Doc. 97) to which Plaintiff responded (Doc. 100).

<u>Background and Facts.</u>

Both sides have presented extremely lengthy factual recitations. Although there
appears to be virtually no undisputed facts in this case[1], the Court will attempt to set out
the basic facts that it deems relevant to the pending motion. There are numerous "facts"
that are asserted by each party that are contradicted or disputed by the other party. It is
not the Court's duty to read every transcript that has been filed in a case to determine who
is telling the truth. See *Karnes v. Runyon*, 912 F.Supp.280, 283 (S.D.Ohio 1995)(Spiegel,
J.).

<u>The Parties</u>

Plaintiff Keith D. Wilkey is a board certified orthopedic surgeon and is currently

---

[1]Except those facts listed below in "The Parties" section.

practicing medicine and surgery in the state of Missouri. Dr. Wilkey is also licensed to practice medicine and surgery in the state of Ohio, as well as other states, and had surgery privileges at McCullough-Hyde Memorial Hospital ("MHMH"). Dr. Wilkey has a sub specialty in spine surgery. Wilkey had privileges at MHMH for the time period relevant to this matter. (Wilkey Depo., p13, 18 , 31).

Plaintiff has named MHMH as a Defendant as well as numerous individual defendants who are members of the Medical Staff at MHMH and Defendant Edwin H. Season III, M.D. Dr. Season is an orthopedic surgeon licensed to practice medicine and surgery in Ohio. He practices orthopedic surgery in Columbus, Ohio and provides external peer review services for hire through The Quality Management Consulting Group, Ltd. (Season Depo. pp. 7-8).

Defendant Rolf F. Brunckhorst, M.D. is a general surgeon licensed to practice medicine and surgery in Ohio. He is the Chief of Surgery at MHMH. (Brunckhorst Depo., p6). He is also a member of the Bylaws and Credentials Committee and the Medical Executive Committee.

Defendant Paul J. Cangemi, M.D. is an orthopedic surgeon with privileges at MHMH and is a direct competitor of Dr. Wilkey and Dr. Gula. (Cangemi Depo., p5). He is also a member of the Bylaws and Credentials Committee and the Medical Executive Committee.

Defendant Richard A. Daniels is the President and Chief Executive Officer of the MHMH. (Daniels Depo, p 4). He is also a member of the Bylaws and Credentials Committee and the Medical Executive Committee.

Defendants Mary M. Knoedler, M.D., Hillary Ann Evans and Defendant Mary C. Moebius, M.D. are radiologists with privileges at MHMH. (Knoedler Depo., pp5-6; Evans

2

Depo., p4; Moebius Depo, p4).  Dr. Knoedler served on the Ad Hoc Committee.  Dr. Evans and Dr. Moebius served on the Hearing Committee.

Defendant James P. Baden, M.D. is a general surgeon with privileges to practice abdominal, colon and rectal surgery at MHMH. He retired in 2003.  He also served on the Hearing Committee.

Defendants Daniel J. Stein, M.D. and Dr. Elzworth Wiesenmayer are physicians with privileges to practice obstetrics and gynecology at MHMH. (Stein Depo., pp6-7; Wiesenmayer Depo., p4).  Dr. Stein was a member of the Hearing Committee.  Dr. Wiesenmayer was a member of the Ad Hoc Committee.

Defendant, Dr. Terry Hunt, is a licensed doctor with privileges to practice internal medicine at MHMH.  (Hunt Depo., p5).  He was also a member of the Ad Hoc Committee.

The Claims

Wilkey was suspended from MHMH and eventually resigned after his privileges had been revoked.  He brings claims of  violations of the Sherman Antitrust Act (Counts 1-4), breach of contract in restraint of trade (Count 5), fraud (Counts 6 and 24), tortious interference (Counts 7-8), filing false databank reports (Count 9), defamation (Count 10), denial of due process (Count 11), breach of contract (Counts 12 and 13), negligence (Counts 14-18 and 25), civil conspiracy (Count 19), tortious concealment (Count 20) and tampering with evidence and records (Counts 21-23).  However, Plaintiff has informed the Court that he is withdrawing his Sherman Antitrust Act claims as well as the parallel state law claims (Counts 1-5) (Doc. 133).  Plaintiff, via counsel, had informed the Court at the charging conference that he would be voluntarily dismissing his due process claim. Plaintiff, via counsel, then contacted the Court and requested that the due process claim

3

not be voluntarily dismissed.  As such, it will be considered below.

Dr. Wilkey's Hiring

Defendant, due to its growing service area, was in need of another orthopedic Surgeon to join Dr. Cangemi and Dr. Gula who were already on staff at MHMH.  (Daniels Depo. pp6-7; Gula Depo. pp5-6).  Linda Jones, Director of Physician Services at MHMH contacted Dr. Wilkey regarding his interest in this position.  (Jones Depo., pp9-10, 12).  In Dr. Wilkey's letter of intent, which he asserts he did not keep a copy of and was "lost" by MHMH[2], Dr. Wilkey explained that he did not want to work in a multi-specialty group and that he needed to have a stable anesthesia program.  (Wilkey, p. 124).

Dr. Wilkey held seven to ten conversations with various MHMH representatives prior to coming to MHMH.  (Wilkey, p. 126).  Among the things promised to Dr. Wilkey were a proper anesthesia program, a trained OR staff and block surgery time.  (Wilkey, p. 132, 170).  Defendants deny that these promises were ever made.  After these numerous discussions, Dr. Wilkey and MHMH entered into a "Physician Service Agreement", Promissory Note and a Security Agreement.  (See Exhibit 14, 15 and 16 to Doc. 56).  These documents provided a guaranteed salary for Dr. Wilkey and included payback provisions for the loan guaranteeing the salary.  Dr. Wilkey began his employment with Midwest Orthopedic on August 1, 2001 and was granted provisional privileges at MHMH.  (Wilkey Depo, 162).  In September 2002, Dr. Wilkey received full credentials at MHMH and a letter of approval.  (Wilkey, p. 296 and 300).  From 2003 to 2004 at MHMH, Dr. Wilkey performed approximately 13 surgeries a week.  Approximately, 10 to 15% of these

---

[2]However, a "Statement of Intent" is provided at Doc. 56, Exh. 13.  It is unclear to the Court if this is the same as Dr. Wilkey's letter of intent that he states was lost.

surgeries were spine-related.  (Wilkey, p. 36).

The Problems

Soon after Dr. Wilkey began his practice in Ohio, he realized that he was not receiving the block time he was promised and various other problems began to emerge, including, problems with the fracture table in the OR (Wilkey, p. 212); problems with a C-Arm device in the OR (Wilkey, p. 214); and Dr. Wilkey being placed on call for all the holidays because he was "17 years behind." (Wilkey, p. 230-232).   In addition, the anesthesiologist serving MHMH left before Dr. Wilkey even arrived.  (Wilkey, p. 150).  This eventually resulted in a meeting and the exchange of words between Dr. Wilkey and Dr. Cangemi in the presence of Linda Jones.  On November 28, 2001, Dr. Wilkey sent a letter to the administration. (Wilkey, p. 240).  This letter was sent out of his concern that the promises made to him were not being kept.   (Wilkey Depo., p. 240-242) (Doc. 73, Exh. 2).

Apparently around the time this letter was sent, some complaints were beginning to emerge as to Dr. Wilkey's behavior. (See Doc. 56, Exhs. 17-19). On or about February 19, 2002, Dr. Wilkey met with Richard Daniels to discuss several issues relating to MHMH. At this meeting, Dr. Wilkey was given a letter.  (Doc. 56, Exh. 20).  Daniels stated in this letter that if the behavior referred to in the letter continues Mr. Daniels was going "to report" Dr. Wilkey to the  Medical Executive Committee ("MEC").  He states further, "if the MEC suspends you, then you'll have to pay back all the money that we've loaned you to start your practice." (Wilkey Depo., p. 282).

Things were quiet from March until November of 2002.  In fact, in September, 2002 Dr. Wilkey was granted full credentials at MHMH.  (Wilkey Depo., p295-296).  Then, in November, 2002, Dr. Wilkey again complained about the equipment problems.  He lodged

his complaint with Sylvia Burkey, the Vice President at MHMH.  She stated to Dr. Wilkey, "How dare you bite the hand that's feeding you."  (Id. at 315, 322).

Starting in December, 2002 complaints were again being made about Dr. Wilkey's behavior.  (See Doc. 56, Exhibits 21-23).

Plaintiff asserts that he was targeted because he complained about issues that were promised to him and because of conflicts with Dr. Brunckhorst, Dr. Cangemi and Mr. Daniels at MHMH.  He further asserts that these "behavioral complaints" that were made against him were in retaliation to his letter addressing the issues that were promised to him but not being honored and his complaints made about the equipment. (See Wilkey, p. 258, 322).

Even though complaints were made regarding Dr. Wilkey's behavior as early as January 2002, Dr. Wilkey was given full credentials at MHMH in September, 2002.  Dr. Wilkey argues that this is proof that from August 1, 2001 to September, 2002 there were really no issues of significance with Dr. Wilkey in the eyes of the Medical Executive Committee and the hospital administration.

The Disciplinary Actions

Eventually, two surgeries that were performed by Dr. Wilkey were reviewed by the Quality Review Physician ("QRP").  The first, in December 2002, due to complications, "dropped out" for peer review.  The second, in January, 2003, was also reviewed due to complications.  The QRP in December, 2002 was Dr. Wiesenmayer, however, since his tenure was to expire at the end of 2002, these two surgeries were reviewed by the new QRP, Dr. Cangemi, who found issues of concern with the performance of the surgeries. Dr. Cangemi is a competitor of Dr. Wilkey.  Dr. Cangemi completed the Medical Peer

6

Review Referral to the Bylaws and Credentials Committee ("B&C Committee")[3] and requested an external review. (Cangemi Depo., p36; Doc. 56, Exhibit 24 and 25). Dr. Season of Quality Management Consulting Group, LTD was hired to conduct the external review. (Doc. 56, Exhibit 26). Dr. Season issued a report. (Doc. 56, Exhibit 27). Dr. Season testified that it is inappropriate for a QRP to review a competitor's surgery if it is more than just a superficial review. (Season Depo., p21-22). It is noted that neither patient filed a complaint against Dr. Wilkey as to these two surgeries. (Brunckhorst Depo., p68).

At the B&C Committee meeting on February 4, 2003, Dr. Brunckhorst and Dr. Ross requested that corrective action be taken and that Dr. Wilkey be suspended. (Doc. 56, Exhibit 29). The B&C Committee then voted to suspend Dr. Wilkey for 30 days and approved a further investigation. (Doc. 56, Exhibit 25). The matter was then forwarded to the MEC[4]. The next day, the MEC considered the suspension and approved it. (Id.). The MEC also referred the matter to an Ad Hoc Committee for investigation.

Dr. Knoedler, Dr. Wiesenmayer and Dr. Hunt served on this Ad Hoc Committee. Dr. Hunt is the godfather to one or more of Dr. Brunckhorst's children. (Brunckhorst Depo., p27; Hunt Depo., p26). Dr. Wiesenmayer and Dr. Brunckhorst have gone sailing together. (Brunckhorst Depo., p 28). The Ad Hoc Committee considered Dr. Season's review.

---

[3] The members of the B&C Committee include, Dr. Ross, Dr. Blucher, Dr. Calkins, Dr. Emmert, Dr. Morris, Dr. Cangemi, Dr. Brunckhorst, Mr. Daniels, Mrs. Jones, Mrs. Pohl, and Mrs. Burkey.

[4] The members of the MEC are Dr. Ross, Dr. Emmert, Dr. Bucher, Dr. Brunckhorst, Dr. Cangemi, Dr. Hoke, Dr. Harlan, Dr. Keller, Dr. Kranbuhl, Dr. Naegele, Mrs. Burkey, Mr. Daniels, Mrs. Erekson, Mrs. Jones and Mrs. Pfohl.

(Knoedler Depo. p19; Wiesenmayer Depo. p16). Dr. Wilkey states that he did not have an opportunity to question Dr. Season's report before the Ad Hoc Committee's ruling. The Ad Hoc Committee interviewed Dr. Wilkey on February 12, 2003. (See Doc. 56, Exhibit 32). On February 19, 2003 the Ad Hoc Committee recommended that the suspension continue. (Doc. 56, Exhibit 33).

On February 26, 2003 a special MEC meeting was held. Dr. Wilkey and his attorney attended this meeting and presented his side of the cases and his opinions as to the external review. (See Doc. 56, Exhibit 25).

On March 5, 2003 the MEC met again to discuss Dr. Wilkey and additional claims as to his honesty, behavior and qualifications were addressed. The MEC extended Dr. Wilkey's suspension for an additional 60 days to further review these issues. (Id.). The MEC also requested that the Ad Hoc Committee meet again to review additional medical charts of Dr. Wilkey and to consider additional evidence as to his behavior. Dawn Pohl met with and interviewed numerous staff employees regarding Dr. Wilkey. (Doc. 56, Exhibit 34). Plaintiff alleges that Defendants "spin" the interviews to fit their interests and provides numerous examples of this in his memorandum. (See Doc. 71).

At some point on or before April 2, 2003, the Ad Hoc Committee requested another external review. (See. Doc. 92-2, p9). It does not appear that the Ad Hoc Committee or any other reviewing body considered this second review or even waited for the report before making its recommendations.

The Ad Hoc Committee reviewed the results of Ms. Pohl's interviews and met again with Dr. Wilkey on April 22, 2003. (See Doc. 56, Exhibit 36). On April 30, 2003, the Ad Hoc Committee concluded that Dr. Wilkey's privileges at MHMH should be revoked based

8

upon his "judgment exercised in patient selection and disruptive behavior."  (Doc. 56, Exhibit 37).

That same day, April 30, 2003, a special MEC meeting was held to review the conclusions of the Ad Hoc Committee.  The MEC voted to accept the Ad Hoc Committee's conclusions and immediately voted to revoke Dr. Wilkey's privileges at MHMH.  (Doc. 56, Exhibit 25).  Dr. Wilkey was notified of this decision and his appeal rights via letter. (Doc. 56, Exhibit 38 and 39).

On April 10, 2003, Dr. Wilkey requested a hearing in response to the extension of his suspension for an additional sixty days.  (Doc. 56, Exh. 40).  After some issues were resolved between the parties, the Hearing Committee held hearings on September 16, 29 and 30th.  Patrick Garretson, a Cincinnati attorney, acted as the Referee.  Dr. Moebius, Dr. Evans, Dr. Baden and Dr. Stein were the Hearing Committee members.[5]  Both the MEC and Dr. Wilkey participated and were given the opportunity to call witnesses.  On November 24, 2003, this Hearing Committee recommended confirmation of the MEC's suspension of Dr. Wilkey.[6]  (Doc. 56, Exh. 47).

Dr. Wilkey then requested an appellate review by the Board of Directors.  (Doc. 56, Exh. 49).  This appeal was held on February 18, 2004 before the Appellate Review Committee of the Board of Directors.  After reviewing the record and considering the written statements of the MEC and Dr. Wilkey, the Appellate Review Committee issued its report referring the matter back to the MEC for further review and recommendations. (Doc.

───────────────

[5]Dr. Moebius and Evans are Dr. Knoedler's partners in a radiology group.

[6]Dr. Wilkey wanted the suspension and the revocation to be held in separate appeal hearings. See Doc. 56, Exhibit 42.

9

56, Exhibit 53).  The MEC met again on March 5, 2004.  The Appellate Review Committee met again on March 12, 2004 in order to receive the report of the MEC from March 5, 2004 and provided Dr. Wilkey an opportunity to respond.  On March 24, 2004 the Appellate Review Committee reconvened and recommended that the Board of Directors affirm the original 30 day suspension as well as the additional 60 day suspension.  (Doc. 56, Exh. 54).  The Board of Directors did just that on March 25, 2004. (Doc. 56, Exh. 55 and 56).

The Hearing Committee was convened again on March 8, 2004 and March 15, 2004 to hear Dr. Wilkey's appeal of the revocation of his privileges at MHMH.  (See Doc. 56, Exh. 43).  The Hearing Committee members were the same panel that heard the appeal of his suspension: Drs. Baden, Evans, Moebius and Stein.  The MEC and Dr. Wilkey were given the opportunity to call witnesses.  These hearings were continued to April 19, 2004 at which time additional evidence was presented.  However, on April 16, 2004, Dr. Wilkey submitted his resignation based upon a breach of their contract. (Doc. 56, Exh. 58).  Due to his resignation, the Hearing Committee never completed its review of the revocation of privileges.

On or about July 22, 2003, MHMH reported the suspension and revocation of Dr. Wilkey's privileges at MHMH to the National Practitioner Data Bank.  (Doc. 73, Exhibit 25).  On September 13, 2004 MHMH instituted an action against Dr. Wilkey in state court for breach of contract to recover certain funds advanced to Dr. Wilkey and secured by the Promissory Note.  (Doc. 56, Exh. 59).  On May 25, 2005, the state court judge granted summary judgment to MHMH.  (Doc. 56, Exh. 61).  The opinion states: "The court does not

know why McCullough-Hyde suspended, and later revoked, Wilkey's membership and privileges.  The record, however, does show that Wilkey and McCullough-Hyde had an agreement, McCullough-Hyde loaned Wilkey $273,701.09 based on the agreement, Wilkey had an obligation to repay this money with interest, and Wilkey failed to do so." (See Doc. 56, Exh. 61, p3).  In so finding, the state court entered judgment against Wilkey in the amount of $366,741.44 plus interest.  (Id.).  Wilkey filed the instant matter on November 12, 2004 (Doc. 1).

<u>Dr. Wilkey's Position and The External Reviews.</u>

Dr. Wilkey challenges the qualifications of Dr. Season, states that he did not receive a fair hearing due to the fact that he did not get to cross examine witnesses, including Dr. Season, states that there were conflicts of interests by, between and among the doctors who served on the various reviewing boards, specifically Drs. Brunckhorst and Cangemi, and that a report from a second external reviewer hired by MHMH was withheld from him. Additionally, Dr. Wilkey alleges that he was punished for behavior that virtually every doctor at MHMH displayed at one time or another.  Various examples are set forth in Plaintiff's response (Doc. 71).

Dr. Season stopped doing spine surgery in 1993 and was not fellowship trained. (Season Depo. pp8-9).  Dr. Season also admits to not reviewing the MRI films of the patients relative to the surgeries he was reviewing. (Id. at 18).  The second reviewer was Dr. Ricciardi.  Dr. Ricciardi reviewed the files and found that Dr. Wilkey did not violate the standard of care.  (Doc. 73, Exh. 14).  Dr. Ricciardi's report was sent to MHMH on or about

11

May 21, 2003. This report was received after the MEC had voted to revoke Dr. Wilkey's privileges (which took place on 4/30/03) but before the appeal of the suspension was heard by the Hearing Committee (which took place over several days in September, 2003) and before the appeal to the Hearing Committee of his revocation (which took place on various dates in March, 2004). However, Dr. Ricciardi's report was not mentioned by any of the reviewing bodies and was not provided to Dr. Wilkey. Dr. Brunckhorst, a member of the B&C Committee and the MEC, was aware that a second review was requested (Brunckhorst Depo., p81). Mary Knoedler, as Chair of the Ad Hoc Committee, knew of the second report since she requested it and Mr. Daniels knew of the second report because he authorized it. (See Doc.92-2, p.3, 7, 17).

It is disputed as to whether or not any of the reviewing bodies, other than Dr. Brunckhorst, the Ad Hoc Committee and Mr. Daniels, even knew of Dr. Ricciardi's report. However, the minutes from the Ad Hoc Committee meeting indicate that Dr. Ricciardi's CV was provided to Dr. Wilkey and it specifically states, "In conclusion, the external reviews are still pending." (Doc. 56, Exh. 36). This would indicate that Dr. Ricciardi was, at least, involved somewhat. (Id.). Dr. Baden has stated that he would have liked to have seen Dr. Ricciardi's report. (Baden Depo., p 23-25). Defendants do not discuss Dr. Ricciardi's report in their motion for summary judgment. However, Defendants, in their reply brief, argue that even if the reviewing bodies knew of Dr. Riccardi's report that the outcome would not have changed and that Dr. Wilkey should have objected to Mr. Garretson, the referee.

Dr. Wilkey alleges that as a direct and proximate result of Defendants' actions, Dr. Wilkey has been foreclosed from the orthopedic surgery and spine surgery markets such that he has been damaged in his business and property, has lost patients and has sustained losses of profit that he would otherwise have made.

<u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, (1986).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587.  However, the nonmoving party may not rest on the mere allegations in the pleadings.  Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-250. In so doing, the trial court does not have a duty to search the entire record to establish that there is no material issue of fact. *Karnes v. Runyon*, 912 F.Supp.280, 283 (S.D.Ohio 1995)(Spiegel, J.). *See also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir.1989); *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988). The non-moving party must designate those portions of the record with enough specificity

that the Court can readily identify those facts upon which the non-moving party relies. *Karnes*, 912 F.Supp. at 283. The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 249-50.

<u>Arguments</u>

Counsel for all parties have each filed voluminous briefs, with voluminous exhibits attached, in this matter fully setting forth their arguments.[7]  The Court declines to restate those arguments in detail here.  See Docs. 56, 71, 73, 80, 81, 92, 94, 97 and 100.

<u>Immunity</u>

Defendants first argue that they are entitled to immunity under The Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §11111(a).  Defendants further argue that they are immune as to all claims raised by Plaintiff under HCQIA.

Regarding the standards for professional review actions, 42 U.S.C. § 11112 states the following:

(a) In general. For purposes of the protection set forth in section 411(a), a professional review action must be taken–

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician

---

[7]Neither party requested leave to exceed twenty pages in violation of Judge Barrett's Civil Trial Procedure I(E) and Local Rule 7.2(a)(1)(3).  However, if the Court stopped reading after twenty pages it would not even get outside of the "Facts" sections of each brief.  Additionally, Plaintiff did not provide a table of contents as is required by the Local Rule and Defendants' citation to the record is scarce.

14

under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 411(a) unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. § 11112(c)(2) goes on to state that for purposes of section (a) above, "nothing in this section shall be construed as ... precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual."

Once the above standard is met, the HCQIA offers immunity to the professional review body, any person acting as a member or staff to the body, any person under contract or other formal agreement with the body, and any person who participates with or assists the body with respect to the action.  42 U.S.C. §11111(a)(1).  However, the Court finds that Plaintiff has rebutted the presumption that MHMH met the standards set forth above.

There are clear questions of fact as to whether or not Defendants met the standard set forth above to qualify for immunity.  Dr. Brunckhorst, the Ad Hoc Committee members, and Mr. Daniels, if not more Defendants, were aware of Dr. Riccardi's report or, at least, that a second reviewer  was in the process of preparing a report.  There exists a question of fact as to why this report, that was requested by one or more of the Defendants due to a concern regarding Dr. Season's qualifications, was not considered by the various reviewing bodies.  It is reasonable for a jury to conclude that Dr. Riccardi's Report, which

is favorable to Dr. Wilkey, was purposefully not disclosed to Dr. Wilkey and the various reviewing bodies. Whether the failure to consider and disclose Dr. Riccardi's report is "a reasonable effort to obtain the facts of the matter" is a question of fact for a jury to determine.

Additionally, MHMH suspended Dr. Wilkey for thirty days without providing an opportunity for him to be heard on the matter. Though 42 U.S.C. §11112(c)(2) allows for this type of immediate suspension, subject to subsequent notice and hearing, it may only be taken when such action may result in an imminent danger to the health of any individual. There exists a genuine issue of fact as to whether or not there was a risk of imminent danger to the health of any individual.

Finally, there is a question of fact as to whether or not this review process was in the furtherance of quality health care or as a way to remove a physician that did not get along well with some of the other doctors. It is also for a jury to determine if Dr. Cangemi's motive was one for quality health care or for competitive reasons. See *Islami v. Covenant Medical Center,* 822 F. Supp. 1361, 1385 (N.D. Ia. 1992) and *Brown v. Presbyterian Healthcare Services*, 101 F.3d 1324, 1335 (10th Cir. 1996).

However, there is no evidence that Drs. Evans, Moebius, Baden, and Stein knew or should have known about the existence of Dr. Riccardi's report. Therefore, immunity shall apply to these four Defendants. Additionally, Dr. Season is entitled to the immunity afforded by HCQIA as he only acted as the external reviewer.

<u>Res Judicata</u>

Defendants argue that the fraud claim (Count 6) and breach of contract claims (Count 12 and 13) are barred due to *res judicata* since these claims were compulsory

counterclaims that Plaintiff was required to bring in the previous state court action filed by Defendants against Plaintiff for breach of contract. (See Doc. 56, Exh. 59, 61 and 62). Plaintiff did, in fact, bring a counterclaim for breach of contract against MHMH in the state action. However, after summary judgment was entered in favor of MHMH on May 26, 2005 by the state court, Plaintiff voluntarily dismissed his counterclaim against MHMH on May 30, 2005 (Doc. 62).

Fed. R. Civ. P. 13 (a) provides: "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication of the presence of third parties of whom the court cannot acquire jurisdiction." As the Sixth Circuit explained in *Maddox v. Kentucky Finance Company, Inc.*, 736 F.2d 380, 382 (6th Cir. 1984), "a compulsory counterclaim arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim." *Sanders v. First Nat'l Bank & Trust Co.*, 936 F.2d 273, 277 (6th Cir. 1991) *citing Maddox, supra.* "It is well established that an opposing party's failure to plead a compulsory counterclaim forever bars that party from raising the claim in another action." *Id. See Baker v. Golden Seal Liquors, Inc.,* 417 U.S. 467, 469 n.1, 41 L. Ed. 2d 243, 94 S. Ct. 2504 (1974).

The Sixth Circuit applies the "logical relationship" test for determining whether a claim arises out of the same transaction or occurrence. *Sanders v. First Nat'l Bank & Trust Co.*, 936 F.2d at 277. Under this test, we determine whether the issues of law and fact raised by the claims are largely the same and whether substantially the same evidence

would support or refute both claims. *Id. citing Moore v. New York Cotton Exchange*, 270 U.S. 593, 70 L. Ed. 750, 46 S. Ct. 367 (1926). In addition, the court must also consider whether the interests of judicial economy and efficiency would be served by requiring that the two claims be heard together. *Awada v. Fast Track Ventures, LLC*, 2005 U.S. Dist. LEXIS 1136 (N.D. Ohio 2005) *citing Maddox v. Kentucky Finance Co.*, 736 F.2d 380, 383 (6th Cir. 1984).

In this action, which was filed prior to the voluntary dismissal in the state court case, Plaintiff is alleging fraud against Daniels and MHMH for inducements made to persuade Wilkey to accept a position at MHMH. This does not arise out of the Physician Service Agreement or Promissory Note that was the subject of the state action. Furthermore, Plaintiff is alleging a breach of contract under the Rules and Regulations. These Rules and Regulations are not part of the Physician Service Agreement that was the subject of the state case and thus does not arise out of the same transaction or occurrence. It is clear from the state court pleadings filed as exhibits in this matter that MHMH sued Wilkey for the return of certain funds loaned to him. In fact, Judge Pater specifically states that the court does not know why MHMH suspended and later revoked Wilkey's privileges. This Court does not find that the fraud claim and breach of contract claim under the Rules and Regulations are barred by *res judicata*.

As to the breach of recruiting agreement against MHMH, the Court believes the Plaintiff is referring to the Physician Service Agreement as there is no "recruiting agreement" referenced anywhere in the record other than in the complaint. If, in fact, the recruiting agreement is the Physician Service Agreement than this claim was compulsory in the state court action. However, Plaintiff did, in fact, bring this claim as a counterclaim

in the state court action but voluntarily dismissed it after summary judgement was entered in MHMH's favor.  Although Plaintiff did not again raise this claim until his Third Amended Complaint which was filed on November 13, 2006, more than one year after the counterclaim was dismissed, the Court finds that this claim is not barred by res judicata or time barred since O.R.C. 2305.06 provides a fifteen year statute of limitation for breach of contract.  Additionally, since this matter was pending when the state court ruled on the MHMH's motion for summary judgment and when Wilkey voluntarily dismissed his counterclaim for breach of contract, it furthers judicial economy to have this claim heard here rather than in state court.

Breach of Contract Under the Rules and Regulations (Count 12)

In *Munoz v. Flower*, 30 Ohio App.3d 162, 166 (1985), the Court of Appeals for Lucas County stated:

> A review of cases from other jurisdictions shows there is a split of authority over whether a hospital's staff by-laws contractually bind the hospital to follow those by-laws. Some cases say that staff by-laws do contractually bind the hospital. * * * [Citations omitted.] Some cases hold that staff by-laws do not contractually bind the hospital. * * * [Citations omitted.] The cases holding that a hospital is bound by its staff by-laws base their decisions on the reasoning that if the hospital is not bound by the by-laws, then essentially the by-laws would be meaningless. The cases holding that a hospital is not bound by its staff by-laws base their decisions on the reasoning that there is no consideration or mutuality of obligation between the parties and therefore the staff by-laws are not a binding contract. The most enlightened reasoning seems to be that staff by-laws can form a binding contract between the doctors and hospital but only where there can be found in the by-laws an intent by both parties to be bound. * * *

See also *Wolf v. McCullough-Hyde Mem. Hosp., Inc.,* 67 Ohio App. 3d 349, 352 (Ohio Ct. App. 1990).  Here after reviewing Exhibits 67 and 68 to Doc. 56, it does not appear that MHMH intended to be bound by the Bylaws and Rule and Regulations.  However, the

medical staff did have an intent to be bound by such documents.  Thus, summary judgment will be granted as to MHMH only on this claim.

### Due Process Claim

Plaintiff alleges that Defendants violated his due process rights by not affording him a fair hearing.  Defendants argue that they are entitled to summary judgment because they did follow the rules set forth in their Bylaws and Rules and Regulations.  Defendants further argue that they are a private hospital.  Therefore, there can be no due process violations without such being done under color of state law.  Plaintiff did not specifically respond to this argument but did provide numerous arguments as to why he believes he did not receive a fair hearing.

The Due Process Clause prohibits any state from depriving a person of "life, liberty, or property, without due process of law. . ."  U.S. CONST. amend. XIV § 1.  To establish a procedural due process violation, a plaintiff must prove that he or she was deprived of a property or liberty interest by a party acting under color of state law without some sort of hearing.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

Although hospital staff privileges are generally considered to be a property or liberty interest of the physician *(Beyer v. Lakeview Community Hosp.*, 1999 U.S. App. LEXIS 17973, 7-8 (6th Cir. 1999)), there is no evidence in the record to support that MHMH or the individual defendants were acting under color of state law.  Thus, Defendants' motion for summary judgment as to this claim is hereby GRANTED.

### Remaining Claims

As to the remaining claims in the Third Amended Complaint, there are numerous genuine issues of material facts that exist as to each claim.  Therefore, the Court declines

to separately address each of Defendants' arguments.  The motion for summary judgement as to these counts will be DENIED.

<u>Conclusion</u>

Defendants Evans, Moebius, Baden, Stein and Season are entitled to the immunity protections of HCQIA and are hereby DISMISSED from this case.  Counts 1 through 5 have been withdrawn by Plaintiff.  Summary Judgment is granted as to all Defendants on Count 11.  Summary Judgment is GRANTED as to MHMH only on Count 12.  Summary Judgment is DENIED as to the remaining claims.

**IT IS SO ORDERED**.

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court
